DISTRIBUTION

**MANN ROBINSON DISTRIBUTION, LLC**

**LICENSE AGREEMENT**

In consideration of the mutual promises set forth below, Licensor and Licensee hereby agree (the "Agreement") as follows:

| | |
|---|---|
| Licensor: | **Marshawn Davis and New Magic Productions** |
| Licensee: | **Mann Robinson Distribution, LLC** |
| Parties: | Licensor and Licensee collectively. |
| Project: | **Walk With Me Tv Series** |
| Programs: | The audio/visual programs and/or events set forth in Schedule "1" attached hereto and incorporated herein by reference, regardless of the available format or length, *e.g*., 3D, HD, SD. |
| Term: | The Term shall commence as of the date of the signature by Licensor on this Agreement on page 2 and shall continue for 2 years. |
| Rights Licensed: | Exclusive Transactional VOD Rights, Subscription VOD , Ad-sponsored VOD Rights, Television Rights , Airline Rights, Hotel Rights, Home-Video Rights, Theatrical Rights, Non-theatrical Rights, and Incidental Rights (as defined in the License Agreement Standard Terms and Conditions). Any qualifications on the Rights Licensed are listed on a per Program basis in Schedule "1." |
| Territory: | Worldwide. |
| Distribution Fee: | 20 Percent (20%) to Licensee of Gross Receipts for all Rights Licensed as defined herein. |
| Payment: | Quarterly. Licensee will pay Licensor no later than 60 calendar days after the close of each calendar quarter for Gross Proceeds received within the previous quarter. The dates of March 31st, June 30th, September 30th, and December 31st shall mark the closing of the 1st, 2nd, 3rd, and 4th quarters, respectively. |

1. CONDITIONS PRECEDENT. This Agreement and any and all of Licensor's and Licensee's obligations under this Agreement, including, without limitation, payment of the Gross Proceeds (as defined), are conditioned upon the following: (i) Licensor's execution of this Agreement and all applicable exhibits thereto in form and substance reasonably satisfactory to Licensee; and (ii) Licensee's approval of the chain of title for each of the Programs, (it being agreed that approval of the chain of title by Licensee or

acceptance by Licensee of any deficiencies therein shall not in any way affect Licensor's warranties and indemnities hereunder, all of which shall remain in full force and effect).

2. GRANT OF RIGHTS. Licensor hereby licenses to Licensee during the Term and in the Territory the Rights Licensed in and to the Programs, including, but not limited to, the necessary literary, artistic, musical, technological, intellectual property rights required for Licensee to exercise the Rights Licensed, subject to the terms and conditions set forth herein. During the Term, Licensee shall have sole and absolute discretion over the exploitation of the Rights Licensed, including, without limitation, the terms of any and all sublicenses and distribution agreements, the identity of any sublicensees and/or distributors, the media and platforms to exploit the Rights Licensed, and any and all other creative or business decisions related to exploitation of the Rights Licensed. In full consideration of all Rights Licensed herein, and all services to be performed by Licensor, Licensee shall pay Licensor the Gross Proceeds in accordance with the terms of this Agreement. Notwithstanding the foregoing, Licensee retains the right to continue to recoup its Distribution Fee and pay Licensor its Gross Proceeds due under this Agreement for Programs licensed prior to termination. In no event are any projections or forecasts by Licensee binding as commitments or promises, or guarantees that Licensee will exercise any of the rights acquired by it in connection with this Agreement.

3. SUBLICENSING. Licensee may not enter into any such sublicense or distribution agreements for any Program with terms longer than the Term hereof without Licensor's prior written approval except that Licensee may enter into a sublicense agreement for Television or Subscription VOD Rights where the term of such sublicense commences during the Term so long as the end of such sublicense of Subscription VOD Rights ends no later than twenty-four months after the Term. Licensee will retain the right to still receive Gross Receipts on Licensor's programs that played during the Term but were paid by sub-licensees after the expiration of the Term.

4. DELIVERY. For each Program, Licensor shall promptly make delivery of all available items specified in Schedule "2" attached hereto and incorporated herein by this reference (the "**Delivery Schedule**") and in accordance therewith. Time of delivery is of the essence to this Agreement. Licensor's failure to make delivery of the Programs in accordance with the Delivery Schedule will impair Licensee's ability to exercise the Rights Licensed in a timely fashion, causing financial harm to Licensee that is difficult to anticipate and quantify, as well as harm to Licensee's goodwill and ongoing business relationships. Therefore, if Licensor fails to make delivery in accordance with the Delivery Schedule, Licensee reserves the right to assess Licensor with a fee (the "Late Delivery Fee"), which is not to exceed $1,000 per Program. Licensee further reserves the right to apply any Late Delivery Fees incurred under this Agreement to outstanding Payments of the Gross Proceeds owed to Licensor.

5. STANDARD TERMS. Additional terms and conditions of the Agreement are contained in the "License Agreement **Standard Terms and Conditions**" incorporated herein by this reference. In the event of any conflict between any of the terms of the License Agreement Standard Terms and Conditions or any other exhibit or attachment, on the one hand, and any other provision(s) of this Agreement, on the other hand, said provision(s) of this Agreement will govern.

IN WITNESS WHEREOF, the parties hereto have signed and delivered this Agreement as of the dates written below.

**Marshawn Davis**
**New Magic Productions**
("LICENSOR")

By: Marshawn Davis

By: New Magic Prod

Name: **Marshawn Davis**
Name: **New Magic Productions**

Its: ______________________

Date: 10/14/2024

Email ______________________

Tax ID Number: ______________________

**Mann Robinson Distribution, LLC**
("LICENSEE")

By: Mann Robinson

Name: **Mann Robinson Distribution, LLC**

Its: ______________________

Date: ______________________

**SCHEDULE "1"**

**SCHEDULE "2"**

**DELIVERY SCHEDULE**

1. DELIVERABLES

Within 7 days of Licensor's execution of the Agreement**,** Licensor shall, at Licensor's cost, deliver a master copy of each Program, the Program's trailer, and as well as the additional items set forth in the Delivery Appendix (the "Deliverables") to Licensee or one of Licensee's approved labs. Thereafter, Licensee shall prepare the Program for its VOD and Home-Video debut (dvd and blu-ray), including ingesting, qc'ing, encoding, obtaining closed captioning, authoring, and delivering of the Program to our various partner platforms ("Initial Delivery Fees"). The Initial Delivery Fees shall be recouped against incoming Gross Receipts.

2. LEGAL DOCUMENTS

No later than 120 days prior to the release of the Program via a medium of the Rights Licensed, Licensor shall, at Licensor's cost, deliver the materials listed below for each Program to Licensee or to any such other address as Licensee may indicate:

(a) A clear, complete and accurate photocopy of each certain Certificate of Copyright which indicates that each of the Programs has been duly registered for copyright with the United States Copyright Office;

(b) Complete and accurate musical cue sheets for the Program(s);

(c) A completed W-9 or W-8 form. Licensor will not be paid the Gross Proceeds until a properly executed W-9 or W-8 form is delivered.

3. INSURANCE DOCUMENTS

No later than 120 days prior to the release of the Program via a medium of the Rights Licensed, Licensor shall provide Licensee evidence that each of the Program is covered by a valid Error & Omission policy and that Licensee is named as an additional insured on such policy.

.

# LICENSE AGREEMENT STANDARD TERMS AND CONDITIONS

1) DEFINITIONS.

a) “Authorized Transmission” shall mean the authorized transmission of a Program within the Territory by any and all means of electronic transmission now known or hereafter devised, by which an end user is authorized to view and/or receive the Program, which transmission means include, but are not limited to, broadcast, cable, satellite, telephonic lines, DSL, broadband, fiber optic, over-the-air wireless transmission, closed systems, virtual private networks, or via the TCP/Internet Protocol, regardless of the device to which the Program is delivered.

a) “Transactional VOD Rights” (TVOD) shall mean the exclusive VOD exploitation of the Program on a platform that charges a distinct fee for the transmission of the Program, regardless of the means by which the consumer watches the Program, ie TV, the Internet, mobile device, smart phone, tablet or otherwise. Transactional VOD Rights include “Electronic-Sell-Through rights (“EST”)”, which allow the consumer to keep a copy of the Program permanently following the one-time transmission, regardless of the means by which the consumer thereafter watches or stores the Program, including the use of Ultra Violet or similar technologies. Transactional VOD Rights also include “Pay-Per-View” (“PPV”) Rights, which shall mean the exclusive right to distribute, exhibit, license, market, sell, publicize, promote and otherwise exploit the Programs by means of “pay-per-view” formats, including, but not limited to, addressable draft transmission to a consumer of temporary copies of the Programs via Authorized Transmission, for which a per program fee is charged to the consumer who selects the Programs for viewing at a variable time that the exhibitor designates.

b) “Subscription VOD Rights” (SVOD) shall mean the exclusive VOD exploitation of a Program on a platform that charges the consumer a periodic flat fee to access the Program from a library of programs for a specific time period, regardless of the means by which the consumer watches Program, ie TV, the Internet, mobile device, smart phone, tablet or otherwise.

c) “Ad-Sponsored VOD Rights” (AVOD) shall mean the exclusive VOD exploitation of a Program on a platform that does not charge the consumer a monetary fee to access the Program, but inserts commercial breaks or other forms of advertising into the Program. AVOD can apply to a number of platforms, regardless of the means by which the consumer watches Program, ie TV, the Internet, mobile device, smart phone, tablet or otherwise.

d) “Television Rights” shall mean the exclusive right to deliver or exhibit the Program by means of over-the-air signals, cable, satellite, or any other electronic or non-tangible medium (whether analog or digital, or via the Internet, or any other electronic or non-tangible medium, now known or hereafter devised), including, but not limited to, free TV (where the consumer may, but need not, be charged a reoccurring access fee), basic pay TV (where the consumer is charged a reoccurring access fee for a specified package of programming, e.g. USA, TNT, History, etc.), and premium pay TV (where the consumer is charged a reoccurring access fee for a premium package of programming, which is in addition to what is offered through basic pay TV, e.g. HBO, Showtime, Starz).

e) “Theatrical Rights” shall mean the exclusive right to distribute, exhibit, license, sell or otherwise exploit the Program for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, that are open to the general public on a regularly scheduled basis and that charge an admission fee to view the Picture.

f) “Home-Video Rights” shall mean the exclusive right to sell, market, license, or otherwise exploit the Program on the following formats: Digital Video Disk (“DVD”) and Blu-Ray Disk (“BRD”), including the authoring and encoding, replication, packaging, and delivery of the Program.

g) “Hotel VOD Rights” shall mean the exclusive right to exhibit, license, market, sell, publicize, promote and otherwise exploit the Programs by means of PPV and/or VOD to and in the hotel marketplace through one or more closed, individual location networks.

h) “Airline Rights” shall mean the exclusive right to distribute, exhibit, license, market, sell, publicize, promote and otherwise exploit the Program for the intended purpose of commercial or noncommercial viewing in the worldwide airline marketplace.

i) “Non-Theatrical Rights” shall mean the exclusive right to license the Program to non-theatrical markets, including, but not

limited to, educational institutions, film societies, film festivals, museums, hospitals and affiliated medical facilities, motor coaches and buses, chambers of commerce, government agencies and entities, religious institutions, non-profit organizations, day-care centers, senior-citizen residences, businesses, conference centers, mobile-home parks, private clubs, parks and recreation facilities, trains operating within the United States, and remote-living facilities for direct projection though 35mm motion picture film, DVD, BLU-RAY, closed-circuit transmission, internet-based delivery or intranet-based delivery. Non-theatrical rights shall also include Cruise Ship Rights, which are the exclusive right to distribute, exhibit, license, market, sell, publicize, promote and otherwise exploit the Program for the intended purpose of noncommercial viewing in the cruise ship marketplace. Non-theatrical rights shall also include Military Base Rights, which are the exclusive right to distribute, exhibit, license, market, sell, publicize, promote and otherwise exploit the Program for the intended purpose of noncommercial viewing in the worldwide military base marketplace. Non-theatrical rights shall also include Maritime Rights, which are the exclusive right to distribute, exhibit, license, market, sell, publicize, promote and otherwise exploit the Program for the intended purpose of noncommercial viewing in the worldwide Maritime marketplace which includes off shore oil rigs and similar structures.

j) "Incidental Rights" shall mean the following:

i) Name and Likeness: The right, subject to any pre-existing contractual restrictions thereon of which Licensor shall give Licensee timely written notice, to use and authorize others to use the name, likeness and/or voice of any person who rendered services in connection with the Programs for the purpose of advertising, promoting or publicizing the Programs.

i) Promotion: The right, to advertise, promote and publicize the Programs, or authorize others to do so, and such advertising, promotion and publicity may include synopses of or excerpts from the Programs or pre-existing advertisements, publicity pieces and promotional materials, in whole or in part, for the Programs; provided, that no more than two (2) sequential minutes of any Program shall be used to promote such Program without Licensor's prior approval; and

ii) Sublicensing: The right to sublicense or subdistribute any of the Rights Licensed on Licensee's behalf upon such terms and conditions as Licensee, in its sole discretion, may deem proper or expedient;

k) "VOD" or "video-on-demand" shall mean the making available of a Program to a consumer for viewing at a time and place selected by the consumer. Licensee may market, sell, license, or otherwise exploit TVOD, SVOD, AVOD on VOD platforms, which shall include but are not limited to Cable/DBS/Telco Platforms; direct broadcast satellite (DBS) operators including but not limited to DirecTV and Echostar (Dish Network); all cable television multi-system operators (MSO) including but not limited to (United States) Adams CATV, Allegiance Communications, LLC, Allen's TV Cable, Americable International, Armstrong Group of Co., Arvig Communication Systems, Atlantic Broadband, Bay Cable Management, BendBroadband, Blue Ridge Communications, Bresnan Communications, Bright House Networks, LLC, Broadstripe, Buckeye CableSystem, Buford Media Group, LLC, Cable America Corp, Cable Management Associates, CableOne, Cablevision Systems Corporation, Carson Communications d/b/a Rainbow Communications, Cass Cable TV, Charter Communications, Comcast Cable Communications, CommuniComm Services, Comporium Communications, Cox Communications, Eagle Communications, Galaxy Cable, Inc, Garden Valley Telephone Company, General Communication, Inc (GCI), Grande Communications, Greene County Partners, Inc., Hector Communications Corp, Insight Communications, Inter-Mountain Cable, Inc., JetBroadband VA, LLC, K2 Communications, LLC, KLiP Interactive, LLC, Knology Holdings, LongView Communications, Massillon Cable TV, Inc, Mediacom Communications Corp., MetroCast Cablevision, Midcontinent Communications, Mid-Hudson Cablevision, MidOcean Partners, NewWave Communications, Northland Communications Corporation, NPG Cable, Orange Broadband Holding Company, LLC, Rapid Communications, RCN Corporation, Rocky Mountain Cable, Schurz Communications, Inc, Service Electric, Shenandoah Cable Television, Sjoberg's Cable TV, Suddenlink Communications, Sunflower Broadband, Sweetwater Cable TV, T.V. Services Inc, Tele-Media Corporation, Time Warner Cable, US Cable Corporation, Uvision, LLC, Vista III Media LLC, WaveDivision Holdings, LLC, WEHCO Video, Inc., WideOpenWest; (Canada) Access Communications, Aurora, Bragg Communications, EastLink, Persona, Coast

Cable, Delta Cable, Northern Cablevision, Cable Axion, Cablevision, Cogeco Cable, Dery, Look, Mountain Cablevision, Novus Entertainment, Rogers Communications, Rush, Shaw Cable, Vidéotron, Westman, VIC Communications; (Mexico) CableVision, SKY Latin America, Multivision, CABLECOM, MegaCable; and telecommunications/IPTV operators and/or set top box programmers specifically including AT&T, and Verizon providing VOD technology within the residential home or place of business; Internet/Online/Wireless/Mobile Platforms including but not limited to: Amazon Instant Video, Amazon Prime, Android Marketplace, Apple iTunes, Dish/Blockbuster, Cinema Now, Tevi, Daily Motion, EZ Takes, Facebook, Fandor, Hulu, Hulu Plus, Indipix Unlimited, Indie Movies On Line, Jaman, Love Film, Microsoft Xbox Live, Nintendo Wii, Overdrive, Redbox (Digital only not physical), Snag, Sony Playstation, Vudu, Vuze, and YouTube (Google).

2) CALCULATION OF GROSS PROCEEDS.

a) "Gross Receipts" shall mean the aggregate of one hundred percent of all 100% of all sums actually received by Licensee from third parties from the exploitation of the Rights Licensed, excluding sums received by Licensee and/or affiliates which represent sales taxes, value added taxes, excise taxes, and similar taxes which are collected by Licensee and/or affiliates as required by any requisite taxing authorities of any government.

b) "Distribution Expenses" shall mean all actual third-party costs and expenses paid, advanced or incurred by Licensee (net of all discounts, rebates and the like) or any of its affiliates in connection with the distribution, advertising, exploitation and turning to account of the Programs of whatever kind or nature and apportioned on a fair and equitable basis. Without limiting the generality of the foregoing, the following particular items as applicable shall be included in distribution expenses hereunder, subject to the above criteria: (i) all costs in connection with selling, promoting and advertising the Programs, including publicity, promotional trailers, premium items, design/mechanical production work, marketing presswork, posters, ad slicks, trade advertising, consumer advertising, artwork, fulfillment, co-op advertising, e-mail announcements, website production, screenings and creation and duplication of "on-air" spots of whatever length or nature for exhibition in any media, (ii) if applicable, costs to obtain and protect the copyright of the Programs and costs incurred by reason of claims asserted by third parties (including reasonable outside attorney's fees), and costs in connection with the collection of monies. The " delivery fees" , will be automatically deducted from gross proceeds prior to any profit participation

c) "Taxes" shall mean all taxes which are levied upon or payable by Licensee and its affiliates with respect to all or part of the revenues derived from the exploitation of the Rights Licensed, or upon remittance of all or part of such revenues, but specifically excluding corporate income taxes levied on net profits of Licensee and its affiliates. In no event shall the deductible amount of any such taxes (however denominated) imposed upon Licensee or its affiliates be decreased (nor the Gross Receipts increased) because of the manner in which such taxes are elected by Licensee to be treated in filing net income, corporate franchise, excess profits or other tax returns.

d) "Gross Proceeds" shall mean the Gross Receipts, less Distribution Fee, less Initial Delivery Fee, less Distribution Expenses and less Taxes. Licensee and Licensor acknowledge and agree that Licensee has made no representation that the Programs will generate any Gross Proceeds, or any particular amount of Gross Proceeds. Gross Proceeds are at all times subject to retroactive adjustments for returns, refunds, credits, settlements, rebates and discounts.

e) With respect to any Mann Robinson Distribution Media-controlled SVOD service, Licensor shall be compensated as follows: All participating programs in the Mann Robinson Distribution SVOD service will split a pool of 20% of the Gross Receipts received from subscribers to the Mann Robinson Distribution SVOD service during the particular quarter, with individual Programs being specifically compensated on a pro-rata basis based on the percentage of minutes the Program is watched by subscribers to the Mann Robinson Distribution SVOD service compared to the overall amount of minutes all programs are watched on the Mann Robinson Distribution SVOD service for that particular quarter. For example, if program A is watched for 5,000 minutes out of a total 50,000 minutes watched by subscribers to the Mann Robinson Distribution SVOD service for a particular quarter, the licensor of program A would receive 10% of the applicable pool of Gross Receipts available to licensors for that sample quarter. Licensor will not be charged any Distribution Expenses related to the hosting,

marketing or support expenses of the Mann Robinson Distribution Media-controlled SVOD service.

3) INSURANCE. For all Programs for which an Error and Omission policy is in effect upon the date first set forth above, Licensor shall add Licensee its entities and the officers, directors, employees, shareholders, members, representatives, agents, licensees, successors and assigns of each of the foregoing as additional insureds, with no obligation to pay premiums whatsoever. Licensor shall cause its insurer(s) to waive subrogation rights against such additional insureds. Licensor shall pay all deductibles under all such insurance policies. Licensor's insurance shall be primary and without right of contribution from any other insurance not specifically purchased by Licensor to be in excess of or in contribution with the required insurance, and shall operate as if there were a separate policy covering each additional insured. Licensor shall also advise Licensee of any and all claims submitted under the applicable Error and Omission policy. In the event that Licensor has not obtained an Error & Omission policy covering Program(s) of this Agreement and any person or entity makes any claims or institutes any suit or proceedings alleging any facts, which if true, would constitute a breach by Licensor of any warranty, representation or agreement herein made, Licensee shall give prompt written notice of same to Licensor and Licensor or the Copyright Holders shall undertake at its/their own cost and expense the defense thereof and shall supply competent and experienced counsel to defend any such suit or proceeding. Notwithstanding the foregoing, Licensee shall have the unfettered right to defend itself from any such claim, suit or proceeding and withhold, deduct, and/or recoup its defense costs including its Error & Omission policy's deductible.

4) REPRESENTATIONS AND WARRANTIES.

a) Licensor hereby agrees, warrants and represents as follows:

i) Licensor has the right to license to Licensee the Rights Licensed, including but not limited to the necessary literary, artistic, musical, technological, intellectual property rights (including without limitation copyrights, rental and lending rights, and rights related to copyright and/or neighboring rights recognized under the law of any jurisdiction in the Territory), and there are no restrictions which could or would prevent Licensee from exercising any Rights Licensed to Licensee hereunder.

ii) Licensor has the authority to and is free to enter into and fully perform this Agreement.

iii) Licensor has paid or will pay all charges, taxes, fees and other amounts which have been or may become owed in connection with the Programs or the exploitation of Rights Licensed (except as set forth in 4 (a) (iv) below), and there are no pending claims, liens, charges, restrictions or encumbrances on the Programs (other than traditional guild liens and a banking facility security interest for which Licensee shall bear no responsibility whatsoever) or on the Rights Licensed.

iv) Licensor has paid or will pay all wages, gross or profit participations, residuals, equitable or other remuneration for rental and/or lending rights, reuse fees, synchronization/mechanical royalties, and any and all other payments which must be made in connection with the Program and in connection with exploitation of Rights Licensed, to any third parties including, but not limited to, musicians, directors, writers, producers, narrators, announcers, publishers, composers, on-camera and off-camera performers and other persons who participated in production of the Program, and to any unions, guilds or other labor organizations, including the following that apply to the Program:_________.

v) The main and end titles of the film and/or video elements of the Programs and all publicity, promotion and advertising information and materials supplied by Licensor will:

(1) Contain all necessary and proper credits for the actors, directors, writers and all other persons appearing in or connected with the production of the Programs who are entitled to receive the same, and

(2) Comply with all applicable contractual, guild, union and statutory requirements and agreements.

vi) Exercise of the Rights Licensed hereunder will not infringe on any rights of any third party, including, but not limited to, rights affecting copyright, rental and lending rights, rights related to copyright and/or neighboring rights recognized under the law of any foreign jurisdiction in the Territory, patent, trademark, unfair competition, contract, property, defamation, privacy, publicity or "moral rights."

vii) Licensor has not granted and will not grant any Rights Licensed or any other rights in the Programs that derogates or

interferes with the Rights Licensed; and Licensor has not granted and will not grant to any third party the right to broadcast, cablecast or otherwise telecast the Programs on basic cable, premium cable, free or any other television systems for 180 days after the Program's "new release" transactional VOD debut, i.e., when the Program is priced as a standard new release title in the TVOD window, which follows any day-and-date TVOD or ultra TVOD debut, if applicable.

viii) The Programs are currently protected by copyright in the Territory, and Licensor shall maintain such protection in full force and effect during the Term.

ix) Licensor has secured or will secure all necessary written consents, permissions and approvals for incorporation into the Programs of the names, trademarks, likenesses and/or biographies of all persons, firms, products, companies and organizations depicted or displayed in the Programs, and Licensor has secured or will secure all necessary written consents, permissions and approvals for incorporation into the Programs of any pre-existing film or video footage produced by third parties.

x) The execution, delivery and performance of this Agreement shall not result in the breach or non-performance of its organizational documents or any agreements it has with any third-party.

xi) Licensor has obtained an Errors and Omissions insurance policy for each Program listed in Schedule 1 of the Agreement.

xii) Licensor shall timely pay any Approved Lab that works on the delivery of the Program for any services rendered.

xiii) Each and every one of the representations and warranties made by Licensor in this Agreement shall be cumulative, shall survive the Term and shall continue in full force and effect after expiration or termination of this Agreement whether by operation of law or otherwise.

b) Licensee hereby agrees, warrants and represents as follows:

i) Licensee has due authorization to enter into and fully perform this Agreement;

ii) Licensee shall comply with all credit or advertising requirements or restrictions of which Licensee shall receive notice from Licensor;

iii) Licensee shall take no action in connection with its exercise of the Rights Licensed that derogates or interferes with any rights reserved to Licensor.

5) <u>INDEMNITY</u>.

a) Licensor shall forever indemnify, defend and hold harmless Licensee, and its parents, subsidiaries, divisions, affiliates, related companies and its distributors and its and their respective officers, directors, employees, agents, successors, assigns and licensees from and against all third-party claims, actions, losses, liability, costs, expenses, damages, judgments, demands, and settlements, including reasonable outside attorneys' fees and court costs, which may be suffered, made or incurred by such parties arising out of or in connection with any material breach by Licensor of any of Licensor’s representations, warranties, undertakings or agreements of any nature whatsoever made or entered into by Licensor in connection with this Agreement to the extent that such claims do not arise out of a breach by Licensee of this Agreement.

b) Licensee shall forever defend, indemnify and hold harmless Licensor, its parent company, affiliates, subsidiaries and the officers, directors, employees, agents, successors and permitted assigns and licensees from and against all third-party actions, losses, liability, costs, expenses, damages, judgments, demands, and settlements including reasonable outside attorneys' fees and court costs, which may be suffered, made or incurred by such parties arising out of or in connection with any material breach by Licensee of any of Licensee’s representations, warranties, undertakings or agreements of any nature whatsoever made or entered into by Licensee in connection with this Agreement to the extent that such claims do not arise out of the breach by Licensor of this Agreement.

c) Either party seeking indemnification under this Agreement (the “Indemnified Party”) shall provide prompt, written notice of a claim or matter covered under this Paragraph to the party required to provide indemnification hereunder (the “Indemnifying Party”). The written notice can be by way of email and must contain any relevant information relating to the claim or matter, including, but not limited to, court filings and any communications received or sent by the Indemnified Party relating to the claim or matter.

d) The Indemnified Party shall afford the Indemnifying Party the opportunity to participate in any compromise, settlement, litigation or other resolution of such claim, or, at the election of the Indemnified Party, shall require the Indemnifying Party to assume the defense of any such claim or litigation, provided, however, that in the event the Indemnified Party elects to require Indemnifying Party to assume such defense, Indemnifying Party shall afford Indemnified Party the opportunity to participate fully in such defense at Indemnified Party's expense. Neither party shall compromise, settle or otherwise resolve such claim or litigation without the other party's prior written consent, which shall not be unreasonably withheld, provided, however, that failure to respond within ten (10) business days following receipt of written notice at the address set forth above shall constitute consent to the proposed compromise, settlement or resolution.

e) The Indemnifying Party shall not, except with the consent of the Indemnified Party, consent to entry of any judgment or administrative order or enter into any settlement that (i) could affect the intellectual property rights or other business interest of the Indemnified Party; or (ii) does not include as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified party of a permanent release from all liability with respect to such claim or litigation; or (iii) requires any consideration other than the payment of money by the Indemnifying Party.

f) In the event that the Indemnifying Party does not accept the defense of and reasonably resolve any matter as above provided, the Indemnified Party shall have the full right to defend against any such claim or demand, and shall be entitled to settle or agree to pay in full such claim or demand, in its sole discretion, without releasing any obligation or liability of the Indemnifying Party. Further, if the Indemnifying Party does not accept the defense of and reasonably resolve any matter as above provided, the Indemnified Party reserves the right to offset any settlement amount or payment made regarding the claim or demand from any outstanding payments owed to the Indemnifying Party.

g) In the event that the Indemnifying Party does not accept the defense of and reasonably resolve any claim or matter covered under this Paragraph, the Indemnified Party reserves the right to halt any outstanding payments owed to the Indemnifying Party or offset its reasonable attorneys' fees and defense costs incurred relating to the claim or matter from any outstanding payments owed to the Indemnifying Party.

h) This Paragraph shall survive the suspension, termination or expiration of this Agreement, whether by operation of law or otherwise.

6) <u>COPYRIGHT PROTECTION/ADDITIONAL INSTRUMENTS</u>. In the event Licensor shall fail to maintain copyright protection for the Programs pursuant to Paragraph 4(a)(viii) hereof, Licensee shall have the right as attorney-in-fact for Licensor to renew or obtain and register the copyright therein in Licensor's name, and to execute and record such documents as Licensee may deem necessary to evidence Licensee's rights hereunder. Licensee shall also have the right to bring, prosecute, defend and appear in suits, actions and proceedings of any nature regarding any and all (a) copyrights in and to the Programs and all renewals thereof, and (b) any infringement or interference with any of the rights hereby granted under said copyrights or renewals thereof. Any such action may be brought in Licensee's own name or in the name of the copyright proprietor, but at the expense of Licensor, and, at Licensee's sole election, Licensee may join such copyright proprietor (and/or Licensor if copyright proprietor is a person or entity other than Licensor) as a party plaintiff or defendant in any such suit, action or proceeding. Without limiting any of its rights to otherwise enforce the terms of this Agreement, in the event Licensor shall breach any other representations and warranties contained in this Agreement, Licensee shall have the right as attorney-in-fact for Licensor to take all reasonable and necessary steps to preserve the Rights Licensed and other rights herein granted, including but not limited to making payments due to third parties, and having done so Licensee may thereafter deduct from the amounts payable to Licensor hereunder any and all payments so made, as well as any and all costs incurred in connection therewith. Licensor shall promptly execute, acknowledge and deliver to Licensee all other documents which Licensee may reasonably require to effectuate any of the purposes and intents of this Agreement, including, for purposes of this Paragraph, a power-of-attorney in the form reasonably acceptable to Licensee.

7) <u>CONFIDENTIALITY</u>. Except as otherwise required by applicable federal and state securities law, neither party hereto shall disclose to any third party (other than respective employees, in their capacity as

such) any information with respect to the terms and provisions of this Agreement during the Term of this Agreement and thereafter except: (a) to the extent necessary to comply with law, administrative order or rule or the valid order or decree of a court of competent jurisdiction, in which the potentially disclosing party shall so notify the other party and shall seek confidential treatment of such information, or (b) as part of its normal reporting or review procedure to its partners, its divisions, its affiliates, its financiers, its financial advisers, auditors and its attorneys, and its profit participants (to the extent deemed necessary by the disclosing party); provided, however, that any and all such parties agree to be bound by the provisions of this Paragraph. Notwithstanding anything herein to the contrary, any party to this Agreement (and any employee, representative or other agent of any party to this Agreement) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure; provided, however, that such disclosure may not be made to the extent required to be kept confidential to comply with any applicable federal or state securities laws. Except for Licensee's promotional activities concerning the exercise of the Granted Rights by Licensee, neither party shall, in any event, cause or authorize the issuance, circulation, publication or dissemination, by any means, of any publicity, news stories or articles relating, directly or indirectly, to this Agreement and to the licensing of the Programs hereunder without the approval of the other party. Compliance herewith shall be a material condition of this Agreement.

1) LICENSOR BANKRUPTCY. In the event of Licensor's bankruptcy, Licensor and Licensee acknowledge and agree that the licensed rights hereunder are fundamentally in the nature of "intellectual property" as defined in the Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor statute (the "Bankruptcy Code"); that Licensee's continued enjoyment of all licensed rights is fundamental to the basic license hereunder; and therefore all licensed rights should be deemed intellectual property subject to Licensee's election under Section 365(n)(1)(B) of the Bankruptcy Code. Licensor and Licensee agree that the definition of "intellectual property" in Title 11 of the United States Code shall also include trademarks and service marks, as trademarks and service marks are inextricably linked to the other intellectual property to which rights are granted to Licensee under this Agreement. Licensor and Licensee agree that upon any election by Licensee pursuant to Section 365(n)(1)(B) of the Bankruptcy Code, Licensee shall be entitled to retain the license of the Rights Licensed for the Territory and Term herein licensed.

2) HEADINGS. The headings of this Agreement or any paragraphs of this Agreement are inserted only for the purposes of convenient reference and it is acknowledged that they may not accurately or adequately describe the contents of the sections or paragraphs which they head. Such headings shall not be deemed to limit, cover or in any way affect the scope, meaning or intent of this Agreement, or any part of this Agreement, nor shall they otherwise be given any legal effect.

3) RELATIONSHIP OF PARTIES. The Parties acknowledge that no partnership or joint venture relationship is intended nor created by this Agreement and Licensee shall not be deemed a fiduciary, partner, joint venture or agent of Licensor. The Parties intend to be independent contractors under this Agreement. No affiliate of Licensee shall be considered as an agent for or as the same entity as Licensee. Licensee shall have sole discretion: to determine the parties, royalties, and other financial terms, and all other terms of each agreement, if any, entered into by Licensee for the exploitation of Rights Licensed; to settle any claim with respect to any such agreement or the Rights Licensed. Licensee makes no representation or warranty with respect to Licensee's efforts in connection with the exploitation of Rights Licensed or that such exploitation will result in any amounts payable to Licensor.

1) GOVERNING LAW. This Agreement and any claims relating to or arising from it shall be construed, interpreted, and governed pursuant to the laws of the State of California, without regard to its conflict of laws principles.

2) SEVERABILITY. Should any provision of this Agreement, or the application thereof, be held invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement, other than the provision(s) that shall have been held invalid or unenforceable, shall not be affected thereby and shall continue to be valid and enforceable to the fullest extent permitted by law or equity.

3) PUBLICITY. Either Licensee or Licensor may publicize the business relationship of the Parties by way of a press release, provided that no confidential information as defined herein may be disclosed. Either Party desiring to issue a press release about the business relationship of the Parties must first seek and obtain approval of the content of the press release of the other Party. Such approval shall not be unreasonably withheld. Licensor consents to Licensee's animated logo appearing prior to the body of the video of the Program(s) and the trailer.

4) MODIFICATION OR AMENDMENT. This Agreement cannot be modified, amended, or changed in any way except by a written instrument executed by both parties. Emails evidencing clear intent of the Parties shall be an acceptable form of writings for Amendments to this Agreement.

5) TERMINATION OF AGREEMENT AND RENEWAL. Either party wishing to terminate the Agreement at the end of the Term shall give the other party written notice (email sufficient) no later than 45 days prior to the end of the Term. Absent such notice, the Agreement, thereafter, shall continue for additional one-year Terms ("Renewal Period(s)") until such notice is ultimately given.

6) LEGAL ACTION. Any legal action arising out of or relating to this Agreement shall be brought in a court of competent jurisdiction within two years of any purported breach of this Agreement or the accrual of the claim or the cause of action. The prevailing party in any legal action arising out of or relating to this Agreement shall be entitled to its reasonable attorneys' fees incurred in that legal action.

7) LIMITATION OF LIABILITY. ASIDE FROM THE OBLIGATIONS SET FORTH IN PARAGRAPHS 5 AND 7 OF THE LICENSE AGREEMENT STANDARD TERMS AND CONDITIONS, IN NO EVENT WILL LICENSEE BE LIABLE TO LICENSOR OR ANY AFFILIATE OF LICENSOR FOR ANY EXEMPLARY, SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL, COMPENSATORY, PUNITIVE OR ANY SIMILAR DAMAGES WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR ANY OTHER THEORY OF LIABILITY, INCLUDING, BUT NOT LIMITED TO, LOSS OF ACTUAL OR ANTICIPATED REVENUES OR PROFITS, LOSS OF BUSINESS, CUSTOMERS OR GOODWILL, INTERRUPTED BROADCASTS, REIMBURSEMENT FOR EXPENDITURES OR INVESTMENTS MADE OR COMMITMENTS ENTERED INTO, ADVERTISING COSTS OR OVERHEAD OR ANY OTHER COST INCURRED BASED UPON THIS AGREEMENT FOR ANY CAUSE WHATSOEVER. IN NO EVENT WILL THE AGGREGATE LIABILITY OF LICENSEE IN CONNECTION WITH THIS AGREEMENT EXCEED THE GROSS PROCEEDS THAT SHOULD ACTUALLY BE PAID BY LICENSEE HEREUNDER.

8) LIMITATION OF REMEDY. LICENSOR WAIVES ANY RIGHT TO PURPORT TO TERMINATE, SUBJECT ONLY TO PAYMENT OF THE GROSS PROCEEDS, THE RIGHTS LICENSED HEREUNDER OR TO PURSUE ANY REMEDIES IN CONNECTION WITH THIS AGREEMENT OTHER THAN AN ACTION FOR MONEY DAMAGES. IN NO EVENT SHALL LICENSOR HAVE THE RIGHT TO ENJOIN LICENSEE'S EXERCISE OF THE RIGHTS LICENSED OR ANY OF ITS RIGHTS HEREUNDER OR TO TERMINATE OR RESCIND THIS AGREEMENT OR ANY OF THE RIGHTS LICENSED TO LICENSEE IN THIS AGREEMENT.

9) RECORD-KEEPING AND AUDIT.

a) Licensee shall maintain and keep complete and accurate books and records concerning the amounts payable to Licensor for one (1) year following each particular quarterly payment of the Gross Proceeds.

b) Upon reasonable advance written notice (in no event less than 30 days), for up to one (1) year following each quarterly payment of the Gross Proceeds (the "Audit Period"), Licensor, at Licensor's sole expense, may appoint an independent certified public accountant not then engaged in any audit of Licensor or Licensee to audit applicable books and records of Licensee at Licensee's principal place of business in the United States for the sole purpose of verifying the amounts due from Licensee to Licensor hereunder. Such audit shall take place during regular business hours, and shall not occur more than once during any twelve (12) month period. The certified public accountant shall not be engaged on a contingency-fee basis and must sign and deliver to Licensee a confidentiality agreement in a form reasonably acceptable to Licensee that protects Licensee's confidential information no less than the terms of this Agreement and no less than Licensor protects its own similar information. Licensor may audit information

contained in a particular quarterly payment only once, and no audit shall be allowed or conducted for a period spanning less than six (6) months.

c) Licensor shall be deemed to have consented to all quarterly payments of the Gross Proceeds rendered by Licensee hereunder, and said quarterly payments of the Gross Proceeds shall be binding upon Licensor and shall not be subject to any objection by Licensor for any reason unless specific objections are provided to Licensee in writing within two (2) years of the rendering of the quarterly payments of the Gross Proceeds.

10) NOTICE AND CURE. If either Party alleges a breach of this Agreement, they must give the other Party written notice of the alleged breach, and allow the other party to cure the alleged breach within 30 days of such notice.

11) ADDRESS CHANGE. If Licensor's failure to notify Licensee of any change in address results in payments being returned as undelivered, Licensee reserves the right to recoup costs associated with the re-processing and re-delivery of any such payments.

12) WAIVER. No term or condition of this Agreement shall be deemed to have been waived, nor shall there be any estoppel against the enforcement of any provision of this Agreement, except by written instrument signed by the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

13) ASSIGNMENT. Licensee may freely assign this Agreement or any rights or obligations hereunder, provided that Licensee's assignee shall be liable for the obligations hereunder following any such assignment.

14) EXECUTION IN COUNTERPARTS. This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute acceptance of the Agreement

15) ENTIRE AGREEMENT. This Agreement, the License Agreement Standard Terms and Conditions, Schedules 1 & 2, and the Delivery Schedule Appendixes contain the entire understanding of the Parties and supersedes all prior oral and written communications of the Parties hereto relating to the subject matter herein.